This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| CHARLES R. BLACKBURN, Derivatively on Behalf of Nominal Defendant TERMINIX GLOBAL HOLDINGS, INC. f/k/a/ SERVICEMASTER GLOBAL HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NIKHIL M. VARTY, ANTHONY D. DILUCENTE, MATTHEW J. STEVENSON, DEBORAH H. CAPLAN, JOHN B. CORNESS, LAURIE ANN GOLDMAN, NAREN K. GURSAHANEY, STEVEN B. HOCHHAUSER, STEPHEN J. SEDITA, and MARK E. TOMKINS <br><br> Defendants, <br> and <br><br> TERMINIX GLOBAL HOLDINGS, INC. f/k/a SERVICEMASTER GLOBAL HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **PUBLIC VERSION** |

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

Plaintiff Charles R. Blackburn ("Plaintiff") brings this verified shareholder derivative complaint for the benefit of nominal defendant, Terminix Global Holdings, Inc. f/k/a ServiceMaster Global Holdings, Inc. ("ServiceMaster" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers (collectively the "Defendants") seeking to remedy certain Defendants' breaches of fiduciary duties, and contribution for violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon its personal knowledge as to himself and its own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including documents produced to Plaintiff pursuant to a books and records demand under Delaware law, a review of publicly available information, filings by ServiceMaster with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE OF THIS ACTION

1.    ServiceMaster provides termite, pest control, cleaning and restoration services.  At relevant times, the Terminix segment, which offers termite and pest control services, constituted a majority of ServiceMaster's revenue and was the core business of the Company. Specifically, it generated 87% of the Company's revenue in 2018 and accounted for nearly 80% of EBITDA in 2018, making it ServiceMaster's most profitable segment. Terminix primarily generates revenue from the annual renewal of customer contracts.

2.    When Terminix's growth began to slow in fiscal 2017, management announced "a new strategy" focused on providing "outstanding customer service" to "deliver consistently strong revenue and earnings growth." Over the next several quarters, ServiceMaster touted that the transformation efforts were successful.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

3.      Unbeknownst to stockholders, ServiceMaster faced growing liability especially in the Mobile Bay, Alabama region due to the failure to adequately inspect, treat, and remediate Formosan termite infestations. The disputes were confidentially arbitrated, thus unknowable to stockholders.  The Company secretly engaged in a practice of denying and/or delaying payments of claims and damage awards without legitimate basis and appealing any award over $1 million to delay payment, regardless of the merits. The Company also attempted to pass on these increasing costs to customers by changing the terms of renewal agreements to provide fewer services while increasing the renewal fees by as much as 1000%.

4.      As an investigation by the Alabama Attorney General's office later found, ServiceMaster "failed to deliver or provide the termite protection services promised in the contracts." When faced with the damages claims, the Company charged "exorbitantly high annual renewal rate increases of up to 1000 percent[, which was] intended to force consumers to cancel their lifetime protection contracts or to accept new Terminix contracts that provided less benefits than consumers' existing lifetime contracts." These findings are corroborated by multiple arbitration proceedings awarding damages exceeding $1 million to customers.

5.      The truth began to emerge on October 22, 2019, when ServiceMaster announced that its profitability had declined 11% year-over-year due in part due to "the resolution of a single $2 million termite damage claim." ServiceMaster also admitted that "[s]tarting in 2018, the company initiated mitigating actions to limit [its] future exposure, including . . . a change in pricing structure." Moreover, the increased prices in the Mobile Bay region had led to "a reduction in termite renewals." On this news, the Company's share price fell $11.44, or 20%, to close at $44.70 per share on October 22, 2019.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

6. On November 5, 2019, the Company held a conference call during which then-Chief Executive Officer Nikhil Varty conceded that the Company "anticipated some customer reductions as a result of the pricing change, but they have accelerated faster than we originally projected and, as a result, are impacting termite renewal revenue and profitability in the short term." Additionally, the settlement of termite damage claims had already impacted revenue by 7% to 8%, more than the historical impact of 4% to 4.5%. On this news, the Company's share price fell $4.83, or 12%, by November 6, 2019.

7. Then, on February 28, 2020, ServiceMaster filed its annual report for fiscal 2019, which revealed that termite damage claims had risen in the Mobile Bay region since 2017 and were significantly exacerbated in 2019, contrary to public statements. As a result, the Company increased its reserves for litigated claims from $4 million as of fiscal 2018 to $40 million as of fiscal 2019.

8. These revelations precipitated the filing of a securities class action in this District against ServiceMaster and certain of Defendants, *In re ServiceMaster Global Holdings, Inc. Sec. Litig.*, Case No. 2:20-cv-02553 (the "Securities Class Action").

9. Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board. The Board is currently composed of nine members, five of whom are named in this action.  As alleged herein, these five directors knew or should have known of the Company's mounting liability related to the Formosan termite damage in the Mobile Bay region and the policies and practices in response which hurt customer retention and Terminix's revenue, yet they allowed the materially misleading statements to issue. Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

## II.    JURISDICTION

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Individual Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

12.    Plaintiff Charles R. Blackburn owns shares of ServiceMaster and has continuously owned his ServiceMaster stock since June 2014.

**Nominal Defendant**

13.    Defendant ServiceMaster is a Delaware corporation with its principal executive offices located at 150 Peabody Place, Memphis, Tennessee 38103.  ServiceMaster's shares traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SERV" until October 5, 2020 when the Company sold its ServiceMaster Brands franchise businesses and changed its name to Terminix Global Holdings, Inc.  The Company's shares trade on the NYSE under the ticker symbol "TMX."

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

**Defendants**

14.    Defendant Nikhil M. Varty ("Varty") was ServiceMaster's Chief Executive Officer ("CEO") and a director from July 2017 until January 21, 2020.  He is named as a defendant in the Securities Class Action.

15.    Defendant Anthony D. DiLucente ("DiLucente") served as Chief Financial Officer ("CFO") and Senior Vice President of ServiceMaster from February 2017 until December 7, 2020. He is named as a defendant in the Securities Class Action.

16.    Defendant Matthew J. Stevenson ("Stevenson") was the President of Terminix Residential, the Company's largest segment, from October 2017 to October 2019.

17.    Defendant Deborah H. Caplan ("Caplan") has served as a director of the Company since July 2019 at all relevant times.

18.    Defendant John B. Corness ("Corness") served as a director of the Company from July 2016 until December 31, 2019.  He was a member of the Audit Committee at all relevant times.

19.    Defendant Laurie Ann Goldman ("Goldman") has served as a director of the Company since December 2015.  She was a member of the Audit Committee at all relevant times.

20.    Defendant Naren K. Gursahaney ("Gursahaney") has served as a director of the Company since December 2017, became the Chair in May 2019.  He was a member of the Audit Committee at all relevant times.

21.    Defendant Steven B. Hochhauser ("Hochhauser") has served a director of the Company since May 2018.  He was a member of the Audit Committee at all relevant times.

22.    Defendant Stephen J. Sedita ("Sedita") has served as a director of the Company since December 2013.  He was a member of the Audit Committee at all relevant times.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

23.    Defendant Mark E. Tomkins ("Tomkins") was a director of the Company from June 2015 until May 2021 and served as Chairman from May 2016 through April 2019.  He was the Chair of the Audit Committee at all relevant times.

24.    Defendants Caplan, Corness, DiLucente, Goldman, Gursahaney, Hochhauser, Sedita, Stevenson, Varty and Tomkins are collectively referred to as the "Individual Defendants."

**Relevant Non-Parties**

25.    David J. Frear ("Frear") has served as a director of the Company since January 2021.

26.    Teresa Sebastian ("Sebastian") has served as a director of the Company since July 2021.

27.    Brett Ponton ("Ponton") has served as the CEO and a director of the Company since September 2020.

28.    Chris Terrill ("Terrill") has served as a director of the Company since July 2021.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

29.    By reason of their positions as officers, directors, and/or fiduciaries of ServiceMaster and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Individual Defendants owed ServiceMaster and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage ServiceMaster in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of ServiceMaster and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to ServiceMaster and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ServiceMaster, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with ServiceMaster, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of ServiceMaster were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of ServiceMaster were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.  Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    d.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     The Directors Responsibility for Managing Risk**

32.     The Board issued a proxy statement soliciting shareholder votes on several proposals on March 21, 2019 (the "2019 Proxy").  The 2019 Proxy detailed the Board's responsibility for managing risks:

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

Our board of directors as a whole has responsibility for overseeing our risk management. The board of directors exercises this oversight responsibility directly and through its committees. The oversight responsibility of the board of directors and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the board of directors about the identification and assessment of key risks and our risk mitigation strategies. The full board of directors has primary responsibility for evaluating strategic and operational risk management and succession planning. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk, including oversight on compliance related to legal and regulatory exposure, and meets regularly with our chief legal and compliance officers. …The Audit Committee and Compensation Committee provide reports to the full board of directors regarding these and other matters.

C.   **Audit Committee**

33.   The 2019 Proxy detailed the role of the Audit Committee in managing risk:

Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk, including oversight on compliance related to legal and regulatory exposure, and meets regularly with our chief legal and compliance officers.

34.   In addition, the 2019 Proxy stated that the Audit Committee was responsible for the Company's "accounting and financial reporting processes" as well as "the effectiveness of [its] internal control over financial reporting and the performance of [its] internal audit function and independent registered public accounting firm."  It also purported to "review[] and assess[] the qualitative aspects of [its] financial reporting, [its] processes to manage business and financial risks, and [its] compliance with significant applicable legal, ethical and regulatory requirements."

V.   **BACKGROUND**

A.   **Terminix Was The "Core" Of ServiceMaster's Business**

35.   ServiceMaster provides termite, pest control, cleaning and restoration services to residential and commercial customers through an extensive service network of more than 8,000 company-owned locations, franchises and license agreements.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

36.     At all relevant times, the Company's Terminix segment consisted of the termite and pest control business which operated primarily in the United States.  Terminix was critical to the Company, generating 87% of ServiceMaster's revenue and nearly 80% of EBITDA in 2018, making it the Company's most profitable business segment.  Approximately 80% of Terminix's revenue was from the annual renewal of customer contracts.  After the first year, the customer could renew at a significantly reduced cost, which incentivized customer retention and resulted in high renewal rates providing stable and recurring revenues.  As such, customer retention was critical to ServiceMaster's financial performance and growth prospects.

37.     Terminix offered an annual termite coverage plan for its customers.  When a customer contacted Terminix, it provided an initial inspection to assess whether the customer's property had an existing termite infestation and typically installed protective liquid barrier or bait stations surrounding the property.  Customers who entered an annual contract received another annual inspection and additional inspections on an as-needed basis.  If termites were discovered, Terminix was obligated to eliminate the infestation at no cost to the customer and to cover the costs of further treatment, damages, and repairs to the customer's property.

38.     Defendants consistently acknowledged in ServiceMaster's public filings that Terminix was ServiceMaster's core business.  For example, at the Company's December 11, 2018 Investor Day, Varty stated:[1]

> [W]hat is ServiceMaster about?  What's the investment opportunity in []our company? Why we are encouraged about the future? ***Pest control business or pest management is the core of who we are. And Terminix is the leading brand in this industry.*** Terminix also … still deliver[s] leading margins in the space.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

This Redacted Complaint Is Filed Pursuant To A Court Order And Stipulation Of Dismissal

**B.    ServiceMaster Claimed Efforts to Transform Terminix Were "Bearing Fruit" In 2018**

39.    In fiscal 2017, Terminix's revenue growth slowed, presenting a serious risk to the Company.   Terminix's adjusted EBITDA declined 11% year-over-year, and analysts cited "Terminix growth [as] the primary issue" for ServiceMaster in 2017.  Similarly, on July 17, 2018, J.P. Morgan issued a report stating that "Terminix organic revenue growth remains the key variable for the S[erviceMaster] stock[.]"  Analysts attributed Terminix's decline to customer service and customer retention.

40.    In response, management announced "a new strategy, which is the Terminix transformation" to revitalize the Company. DiLucente said this strategy would "propel [the Company] into a new era of outstanding customer service, which we believe will really propel us for that organic growth." On October 31, 2017, Varty sought to assure investors that the Company would transform Terminix to "[d]eliver consistently strong revenue and earnings growth."  Varty detailed the "transformation activities" that were underway to "improve our customer retention and profitably grow":

> At Terminix, we are taking a disciplined approach to ***executing a series of systematic transformational activities to significantly upgrade the customer experience, improve our customer retention rates and profitably grow our market share.*** We are building a strong leadership team, with significant experience in delivering results and driving profitable growth . . . At the same time, we are creating an organizational structure that enhances personal accountability and supports a high-performance culture. We are ***empowering our route technicians to deliver an exceptional customer experience*** by giving them the tools they need to improve customer engagement while providing them with timely customer feedback.
>
> ***
>
> We will develop a strong commercial business to better able ***to focus on and serve commercial customers.***
>
> ***

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

We will implement a disciplined, Lean Six Sigma approach to enhance efficiency, *to significantly improve customer levels, strengthen our investment discipline and drive profitable growth.* We are enhancing our ability to consistently deliver on our commitments by increasing our transparency, improving operational cadence and measurement systems and strengthening business processes with a goal of creating long-term sustainable value.

41.    According to the Company, Varty and DiLucente were to lead the transformation along with Pratip Dastidar, ServiceMaster's Senior Vice President and Chief Transformation Officer, and Stevenson as President of Terminix Residential.

42.    During the Analyst Day on December 11, 2018, management touted that Terminix's "transformation efforts are on track." Varty stated, "in 2018, we were able to demonstrate that all the actions we were taking, all the transformation that we launched . . . is bearing fruit" and would "create the sustainable organic growth that we need." Varty also assured investors that "transformation efforts were on track" resulting in "handsome growth" and that "all the leading indicator[s] [were] starting to point in the right direction."

43.    In fact, DiLucente highlighted that the efforts were focused on "better customer engagement" in the residential segment and "the area where we were actually showing declining growth has now turned positive." He noted that "in the third quarter of 2018, we delivered 7.8% growth in the residential pest control segment…. The real opportunity, as Matt [Stevenson] talked about, is retention." DiLucente told investors that Terminix would be "laser focus[ed]" on customer retention in 2019.

### C.    Formosan Termite Damage Presented The Greatest Threat To Terminix

44.    The Formosan termite, known as the "super termite," arrived in the United States several decades ago. It lives in warm, humid climates, and is most found in Gulf Coast states, such as Alabama, Florida, Georgia, Louisiana, Mississippi and Texas. Formosan colonies grow to more than one million termites, allowing the termites to attack a wider variety of wood at a faster rate

11

than other subterranean termites.  As such, the Formosan termite is thought to be the most aggressive and economically damaging termite in the United States, causing approximately $1 billion a year in property damage.

45.    Unlike most termites, Formosan termites construct both underground and above-ground nests, which increases their damage potential.  Formosan termites' above-ground nests are usually located in the walls of structures they infest and are referred to as "cartons."  Property owners depended on Terminix to monitor, prevent, and remediate damage Formosan termites.

46.    Unbeknownst to stockholders, ServiceMaster faced an increasing rate of claims in the Mobile, Alabama region related to Formosan termites beginning in 2017. In some instances, the Company had agreed to remediate the damage. But the Company frequently refused valid claims resulting arbitrations and exposing the Company to punitive damages, in addition to repair costs. Therefore, since 2017, Formosan termite damage presented a significant undisclosed risk to the Company's financial performance.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    Unbeknownst to Stockholders, Terminix Engaged In A Scheme To Renege On Its Contractual Obligations For Formosan Infestations And Faced Significant Liability

47.    Unknown to the Company's shareholders, Terminix routinely failed to adequately inspect, treat, and remediate Formosan termite infestations in the Mobile Bay Region, resulting in mounting claims.  Rather than pay for remediation and damage as it was contractually obligated to do, the Individual Defendants caused the Company to carry out a fraudulent scheme to cover up the impact of the Formosan termites, which stymied Terminix's transformation and its potential for growth, as well as increased the Company's risk and liability for customer termite claims.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

48.     In furtherance of this scheme, the Individual Defendants caused the Company to take several steps.  The Company began denying and/or delaying the payment of claims and damage awards, in whole or in part, without a legitimate basis, and appealing any award over $1 million to delay payment, regardless of the merits.  The Individual Defendants also caused the Company to implement "mitigating" protocols in Formosan hot spots, such as altering renewal contracts to provide fewer services while simultaneously increasing the cost to renew as much as 1000% to drive away customers before they could discover their property was infested by Formosan termites.

49.     In another effort to shield its liability for inadequate treatments, Jeff Storck, the Vice President for the Southeastern Division of Terminix International told branch managers that regardless of any obvious damage, no additional treatments were allowed unless there were currently living visible termites or if the owner altered the treated soil.  The actions were in direct contradiction to customer-centric transformation efforts the Individual Defendants were touting to investors.

50.     Further, the Individual Defendants not only concealed the risk of future claims, they materially understated the accrual associated with its liability for these claims, thereby overstating the Company's reported adjusted EBITDA.  Unbeknownst to investors, "[i]n 2018, a number of consumers in the Gulf Coast Region of the State of Alabama began complaining to the Alabama Attorney General about price increases in their termite protection coverage."[2]  As a result, in 2019 Alabama Attorney General Steve Marshall and the Alabama Department of Agriculture and Industries ("ADAI") to begin an investigation of ServiceMaster's practices.[3]

---

[2] https://terminixfund.com/summary-of-litigation/
[3] *Id.*

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

51.     In November 2020, the Alabama Attorney General's office issued a press release

issued announcing a $60 million settlement with Terminix due to its "illegal business practices

targeting Alabama consumers".[4]  According to the press release:

> An investigation by the Alabama Attorney General's office and the Alabama
> Department of Agriculture and Industries revealed that Terminix engaged in a
> pattern of collecting annual termite protection premiums from Alabama consumers,
> but *failed to deliver or provide the termite protection services promised in the
> contracts* consumers had with Terminix. As a result, many homes and businesses
> suffered termite infestation.
>
> When customers suffered damages as a result of Terminix's failure to provide paid-
> for services, the company simply passed on these costs to Alabama consumers, in
> some cases charging them *exorbitantly high annual renewal rate increases of up
> to 1000 percent*. *Terminix's actions were intended to force consumers to cancel
> their lifetime protection contracts or to accept new Terminix contracts that
> provided less benefits than consumers' existing lifetime contracts*.
>
> In addition to *inadequately treating* consumer homes for termite protection,
> Terminix also *failed to provide consumers with competent and thorough annual
> termite inspections* as required by Terminix contracts. Additionally, Alabama
> consumers were paying extra money to Terminix for pesticide they had already
> paid for and that had already been applied to their homes and businesses.

52.     The settlement agreement required, among other things, that Terminix: (1) set aside

$25 million to refund consumers who were *overcharged by Terminix or forced to pay other

termite control companies money for services they should have received from Terminix*; (2) set

aside $10 million to *re-treat* over 12,000 of its customers' homes in Mobile, Baldwin and Monroe

counties; (3) refund consumers of any *unconscionable price increase* paid by consumers in termite

protection premiums in 2019 and 2020; and (4) provide "[*n]ew, competent, and complete*

---

[4] *See* Steve Marshall, Alabama Attorney General, *Attorney General Steve Marshall Announces
$60 Million Settlement with Terminix Over Illegal Business Practices Targeting Alabama
Consumers* (Nov. 5, 2020), available at https://www.alabamaag.gov/NewsViewer/69822281-
8337-40ec-8761-d603f91f10a6; *see also Attorney General: $60 million settlement reached after
Terminix's alleged illegal business practices targeting Alabama consumers*, WKRG-TV (Nov. 5,
2020), available at https://www.wkrg.com/alabama-news/attorney-general-60-million-settlement-
reached-after-terminixs-alleged-illegal-business-practices-targeting-alabama-consumers/.

*inspections* of homes in the areas affected by Formosan termites." *Id.* In addition, "Terminix has agreed to adopt a reasonable and affordable price increase schedule… Consumers who lost their lifetime Terminix contracts will have them reinstated, if they so desire, at the reasonable price levels consumers were paying Terminix in 2018." *Id.*

53.    The Attorney General found that ServiceMaster's practices in response to increasing Formosan termite damage costs, "violated several provisions of the Alabama Deceptive Trade Practices Act, an Alabama law designed to protect consumers from deceptive, fraudulent, unconscionable, and illegal acts..." *Id.*

54.



55.

56.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal



57.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal



58.     These arbitration proceedings were private as mandated by the Company's customer contracts, allowing the Individual Defendants to conceal ServiceMaster's exposure to litigation and the true state of Terminix.

**B.    The Individual Defendants Caused ServiceMaster To Make Misleading Statements**

59.     Unbeknownst to investors at the time, as finally reported in the Company's 2019 Form 10-K, from December 30, 2017 to December 31, 2018, in the Mobile Bay Region, Litigated Claims increased from 22 to 31 (41%) and Non-Litigated Claims increased from 156 to 254 (69%) due to Formosan termite infestations.[6] Excluded from both the Litigated claims and Non-Litigated

---

[5] ███████████████████████████████████████████████
████████████████████████████

[6] As used in the Company's public filings, "Litigated Claims" means "circumstances when we do not reach an agreement with a customer to remediate the damage and that customer initiates litigation or arbitration proceedings" and "Non-Litigated Claims" means "circumstances when a customer notifies us that they have experienced damage and we reach an agreement to remediate that damage."

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

claims were 4 claims in the Mobile Bay Region, in which the Company claimed "the only material issue in dispute is the actual amount of repair costs, which are simpler to resolve and less volatile[.]"  Nevertheless, the Company only increased its reserves from $1 million to $4 million for Litigated Claims, while its reserves for Non-Litigated Claims remained flat at $7 million over that same time period.

60. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████

61. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████ ██████████████████████████
███████████████████████████████████████████████
█████████████████████████████████

---

[7] The Disclosure Committee is not publicly disclosed as a subcommittee of the Board, nor is its existence of membership discussed the Company's Proxy or other filings with the SEC.  Plaintiff infers that the Disclosure Committee is a management level committee.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

62.     On February 26, 2019, the Individual Defendants caused the Company to issue the press release reporting its financial results for the fourth quarter and full year of 2018.  In the press release, ServiceMaster provided full-year 2019 revenue guidance of $2.02 to $2.05 billion, or an increase of 6% to 8% compared to 2018 and projected organic revenue growth at Terminix in the range of 2%-3%.  Despite the dramatic increase in Litigated and Non-Litigated Claims in 2018, Varty touted the success of the Terminix transformation efforts:

> Our primary goal in 2018 was to transform our Terminix business and **unlock the potential to drive sustainable revenue growth.** We are pleased to report that our focused efforts throughout 2018 and strategic initiatives resulted in **record revenue** at Terminix in the fourth quarter and full year 2018," said ServiceMaster Chief Executive Officer Nik Varty. "Improvements in pest sales, driven by enhanced marketing initiatives, and stronger start and completion rates drove organic growth of 5 percent during the quarter, including over 7 percent in residential pest for a second consecutive quarter.

63.     Later that day, the Individual Defendants held an earnings call to discuss the results with investors.  During the call, Varty emphasized that the Terminix transformation plan was "improving profitability" and creating a "long-term sustainable business model":

> We made tremendous progress on the core business in 2018, while taking on an increased workload to deliver on the spin, which was a major commitment to our shareholders. Revenue growth at Terminix is at levels we haven't seen in over a decade, and new unit sales are at an all-time high. With 5% organic growth in the quarter, we are approaching industry-level growth rates and have direct line of sight to 30% incremental margins. We are focused on improving profitability in the Terminix business, but we are approaching the next steps in a strategic, disciplined manner. We have gone through a period of time in our company history where the emphasis was on short-term cost cutting and it led to sharp declines in customer service levels and, ultimately, a declining growth rate. We are taking the necessary steps to create a long-term sustainable business model that will convert consistent growth, both organically and through acquisitions, to the bottom line. By focusing on our mission of creating cleaner, healthier, safer environments for our customers at home, work and play, we can deliver on our future commitments just as we have done in 2018, and I am confident that executing on our strategic goals in 2019 will lead to significant shareholder value.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

64.    Also during the call, DiLucente stated that among the "other cost drivers in the quarter" was a "$2 million . . . damage claims expense increase, predominantly related to activity in a section of the Gulf Coast."

65.    The $2 million increase in damage claim expense due to activity in the Gulf Coast was a red flag that should have alerted the Individual Defendants to the Company's mounting liability, litigation costs and associated risks related to Formosan termite damage, as well as the Company's fraudulent scheme to mitigate these costs.

66.    The statements in ¶¶62-64, above, were materially false and/or misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

  a.  The transformation was not being successfully executed in the Mobile Bay Area where Formosan termites had become prevalent and the scheme to mitigate the related costs had derailed customer service initiatives which would negatively impact future growth.  For example, Terminix regularly failed to provide: (i) an effective initial inspection for Formosan termites; (ii) effective treatment for Formosan termites; or (iii) necessary remediation of Formosan termite infestations suffered by its customers in Formosan hot spots.

  b.  As a result of the foregoing, Litigated and Non-Litigated Claims and corresponding damages were skyrocketing and in an effort to mitigate its liability, the Company cut customers' benefits and raised the costs for them to renew their contract by as much as 1000% so that: (i) customers with costly Formosan termite infestations that would not renew their contracts before they discovered infestations that the

Company was contractually obligated to remediate; (ii) the Company could limit
its liability for infestations; and (iii) recover litigation costs.

c.    Contrary to claims that it was increasing revenue and growth through its focus on
customer service, costs related to Formosan termite damage and the payment of
customer claims arising from such damage had cost the Company tens of millions
of dollars and the Company knew these costs would continue to impact its
profitability.

d.    The Company's refusal to pay its customers' damages, which were caused in part
by its failure to provide adequate treatment, only increased its liability.  The scheme
delayed the payments of awards, and the recognition of such losses, absent any
legitimate basis which was resulting in punitive damage awards and governmental
investigations.   As such: 1) the Company materially understated the accrual
associated with damages claims throughout the Class Period and artificially inflated
the Company's reported adjusted EBITDA; and 2) the statements regarding the
successful execution of its customer service transformation and its current and
expected financial impact were materially misleading and/or omitted material
information necessary to make them not misleading.

67.    On March 1, 2019, the Individual Defendants caused ServiceMaster to file its
annual report on Form 10-K (the "2018 10-K") with the SEC, which was signed by Defendants
Corness, DiLucente, Goldman, Gursahaney, Hochhauser, Sedita, Varty and Tomkins.  The 2018
10-K stressed the Company's focus on customer retention, stating:

Approximately 80 percent of Terminix revenue comes from customers who enter
into contracts with the option to renew annually. Typically, termite services require
an initial inspection and the installation of a protective liquid barrier or bait stations
surrounding the home. The protection plan contracts provide a guarantee for the

21

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

repair of new damage resulting from termite infestation. After the first year, a customer has the option to renew the contract at a significantly reduced cost that extends the guarantee. Consequently, revenue generated from a renewal customer is less then [sic] revenue generated from a first-year termite customer.

We believe that the strength of the Terminix brand, along with our history of providing a high level of consistent service, allows us to enjoy a competitive advantage in attracting, retaining and growing our customer base. We believe our investments in systems and processes, such as routing and scheduling optimization, robust reporting capabilities and mobile customer management solutions, enable us to deliver a higher level of customer service when compared to smaller regional and local competitors.

Our focus on attracting and retaining customers begins with our associates in the field, who interact with our customers every day. Our associates bring a strong level of passion and commitment to the Terminix brand, as evidenced by the 9-year and 8-year average tenure of our branch managers and technicians, respectively. Our field organization is supported by dedicated customer service and customer care center personnel. Our culture of continuous improvement drives an intense focus on the quality of the services delivered, which we believe produces high levels of customer satisfaction and, ultimately, customer retention and referrals.

68.    Under a section titled "Significant Accounting Policies," the 2018 10-K discussed certain "significant areas requiring the use of management estimates," including "accruals for termite damage claims." Therein the Company stated that there were "no changes in the significant areas that require estimates or in the underlying methodologies used in determining the amounts of these associated estimates" with respect to termite damage claims.

69.    The 2018 10-K further explained the Company's procedures for accounting for termite damage claim accruals, stating in part:

Termite damage claim accruals in the Terminix business are recorded based on both the historical rates of claims incurred within a contract year and the cost per claim. Current activity could differ causing a change in estimates. We have certain liabilities with respect to existing or potential claims, lawsuits, and other proceedings. We accrue for these liabilities when it is probable that future costs will be incurred and such costs can be reasonably estimated. Any resulting adjustments, which could be material, are recorded in the period the adjustments are identified.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

70.    The statements in ¶¶67-69, above, were materially false and/or misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

a.  The scheme to mitigate the costs related to Formosan termites had derailed customer service initiatives which would negatively impact retention and future growth. For example, Terminix regularly failed to provide: (i) an effective initial inspection for Formosan termites; (ii) effective treatment for Formosan termites; or (iii) necessary remediation of Formosan termite infestations.

b.  As a result of the foregoing, claims and corresponding damages were skyrocketing, and in an effort to mitigate its liability, the Company cut customers' benefits and raised the costs for them to renew their contract by as much as 1000% so that: (i) customers with costly Formosan termite infestations that would not renew their contracts before they discovered infestations that the Company was contractually obligated to remediate; (ii) the Company could limit its liability for infestations; and (iii) recover litigation costs.

c.  Contrary to claims that it was increasing revenue and growth through its focus on customer service, costs related to Formosan termite damage and the payment of customer claims arising from such damage had cost the Company tens of millions of dollars and the Company knew these costs would continue to impact its profitability.

d.  The Company's refusal to pay its customers' damages, which were caused in part by the failure to provide inadequate treatment, only increased its liability.  The scheme delayed the payments of awards, and the recognition of such losses, absent

23

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

any legitimate basis which was resulting in punitive damage awards and governmental investigations. As such, the Company materially understated the accrual associated with damages claims throughout the Class Period and artificially inflated the Company's reported adjusted EBITDA.

71. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████

72. █████████████████████████████████████████████████
█████████████████████████████████████ ████████████████
███████████  ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

_____

[8] ████████████████████████████████████████████████████
█████████████████████████████████████

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

73.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

74.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████

75.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

76.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████.

77.    ███████████  on May 7, 2019, the Individual Defendants caused ServiceMaster to issue a press release announcing its financial results for 1Q19 and affirming its full-year 2019 guidance.  Varty was quoted in the release claiming there were "positive trends" in Terminix, including customer retention which was driven by "continued improvement in customer service":

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

"Our solid performance in the quarter reflects the consistent progress we are making on executing our strategic initiatives," said ServiceMaster Chief Executive Officer Nik Varty. "In our pest control core, organic growth of 3 percent in the quarter included 4 percent growth in residential pest and 2 percent in termite and home services, despite the impact of unseasonably cold weather and flooding on our operations and lead flow. We see positive trends in commercial pest with customer retention reaching three-year highs, driven by continued improvement in customer service as we leverage the best practices of Copesan and enhance the customer experience we deliver. ServiceMaster Brands grew revenue organically 5 percent in the first quarter...."

78.     The same day, ServiceMaster held a conference call to discuss the Company's financial results.  Varty again indicated that the Company was successfully executing upon its enhanced customer service initiatives:

Underlying all of these initiatives is reimagining the customer experience. Excellent customer service, easy to talk about but incredibly difficult to consistently deliver. My job as a leader of ServiceMaster is to empower our customer-facing employees with the training, tools and motivation needed to deliver consistently excellent customer service at every touch point. We are creating a culture obsessed with service delivery. And while that mindset will take time to permeate throughout our organization, we are already making great strides.

79.     During the question and answer portion of call, an analyst asked what was driving Terminix's higher pricing and DiLucente misleadingly claimed it was due to favorable market conditions:

[Analyst:] Tony in your prepared remarks, I heard you mention termite pricing a couple of times being better. That's consistent with some of the survey work that we've done recently on the pest control market. Can you just talk about what's driving the better pricing? Is that just Terminix kind of going out and getting what it feels it deserves, where it's been lacking? Or do you feel just like the market is supportive of better pricing? Could you just sort of frame what's driving the better pricing? Because that's something that we're definitely seeing in our survey work.

[DiLucente:] Sure. Thanks, Seth. And I think the latter explanation you gave is really the best answer. The market can support relatively modest price increases year in, year out, and we typically have done that historically, and we did that this year as well. So if you think about – we bill out for these termite services, the increases per customer relatively small and could be absorbed fairly easily. So [a] pretty typical thing for us.

26

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

80.     Varty was asked on the call if he was seeing any "new business trends" in "termite control," and if so, "how [they] [were] performing." Varty responded claiming that ServiceMaster's "renewed efforts to focus heavier on preventive rather than just curative is starting to pay dividends."

81.     The statements in ¶¶77-80, above, were materially false and/or misleading or omitted material information necessary to make them not misleading for the following reasons that were unbeknownst to investors:

  a.  The transformation was not being successfully executed where Formosan termites had become prevalent and the scheme to mitigate the related costs had derailed customer service initiatives which would negatively impact future growth. For example, Terminix regularly failed to provide: (i) an effective initial inspection for Formosan termites; (ii) effective treatment for Formosan termites; or (iii) necessary remediation of Formosan termite infestations suffered by its customers in Formosan hot spots.

  b.  As a result of the foregoing, claims and corresponding damages were skyrocketing and in an effort to mitigate its liability, the Company cut customers' benefits and raised the costs for them to renew their contract by as much as 1000% in hopes that: (i) customers with costly Formosan termite infestations that would not renew their contracts before they discovered infestations that the Company was contractually obligated to remediate; (ii) the Company could limit its liability for infestations; and (iii) recover litigation costs.

c.  The scheme to drive off its customers and cover the costs of damage claims in Formosan hot spots, such as Mobile, drove price increases, not the vague "market conditions."

d.  Contrary to claims that it was increasing revenue and growth through its focus on customer service, costs related to Formosan termite damage and the payment of customer claims arising from such damage had cost the Company tens of millions of dollars and the Company knew these costs would continue to impact its profitability.

e.  As a result, the statements regarding the successful execution of its customer service transformation and its current and expected financial impact were materially misleading and/or omitted material information necessary to make them not misleading.

82.    On May 8, 2019, Defendants Corness, DiLucente, Goldman, Gursahaney, Hochhauser, Sedita, Tomkins, and Varty caused ServiceMaster to file its quarterly report on Form 10-Q for 1Q19 (the "1Q19 10-Q"), which was signed by DiLucente.  With regard to termite damage claims accruals, the Form 10-Q explained the Company's procedures for accounting for termite damage claim accruals, as described supra in ¶69, which were materially false and misleading for the reasons stated in ¶70.

83.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

84.    On August 6, 2019, Defendants Caplan, Corness, DiLucente, Goldman, Gursahaney, Hochhauser, Sedita, Tomkins, and Varty caused ServiceMaster to file its quarterly report on Form 10-Q with the SEC for 2Q19 (the "2Q19 10-Q") which was signed by DiLucente. The 2Q19 10-Q contained the same language concerning the accounting practices for termite damage claims accruals as the 2018 10-K detailed in ¶69 supra, which were materially false and misleading for the reasons stated in ¶70.

85.    On August 6, 2019, Defendants Caplan, Corness, DiLucente, Goldman, Gursahaney, Hochhauser, Sedita, Tomkins, and Varty caused ServiceMaster to issue a press release reporting its financial results for 2Q19, in which Varty was quoted touting the improvements in customer service, customer retention, and pricing at Terminix:

> "Our relentless efforts on improving customer service and focus on employee performance capabilities enabled us to deliver strong organic revenue growth at Terminix, including the best organic growth we have seen in more than three years in our commercial pest service line. Improvements in customer retention and price realization drove growth across revenue channels, which more than offset the impact of unseasonable weather conditions."

86.    The same day, the Company held a conference call to discuss its 2Q19 financial results. On the call, Varty indicated that the Terminix transformation plan was being executed successfully noting a "focus on customer service:"

> Our focus on customer service is continuing to strengthen our core, and Slide 6 provides an example of progress we are making across our businesses…. Starting in Terminix Residential, our focus on the fundamentals is resulting in a measurable, better customer experience built on significant improvements in the basic blocking and tackling of our route-based business. For example, missed appointments were down over 50% in the quarter versus [the] prior year. We are also making progress against our goal of speaking with customers before and after every service visit,

allowing us to clearly explain the value of our services and set expectations for upcoming visits.

***

These initiatives helped drive a 4% reduction in Q2 year-over-year cancel rates in termite and residential pest control. We're also encouraged to see external confirmation of improving customer satisfaction through positive independent survey results over the last few months, one of which recently reported 91% customer satisfaction rate for Terminix, highest in the industry. While that kind of feedback is gratifying, we're not letting up. We know there is still considerable work ahead of us as we challenge ourselves against strong prior year growth numbers in the back half of this year.

87.    During the August 6, 2019 call, when discussing Terminix's incremental margins,

DiLucente reported a figure of 5%, notwithstanding an increase in termite damage claims in the

Gulf Coast, stating in part:

> There was $2 million in increased damage claims expense primarily due to activity in the Gulf Coast region. We also had $4 million in dis-synergies in the quarter. Excluding the impact of $6 million of dis-synergies and SalesForce's investments in the quarter, the incremental margins for Terminix were approximately 5%.

88.    DiLucente additionally stated that the Company had "increased the bottom end of

[its] free cash flow guidance and now expect[ed] to convert adjusted EBITDA to free cash between

55% and 60%."

89.    Varty said on the August 6, 2019 call that Terminix was "definitely the driver" for

positive margin trends in the "second half of the year":

> Yes. We definitely have more margin improvement in the second half of the year in Terminix…. Terminix is definitely the driver. And we have really consistently said that all along that we were going to see lower incremental margins in the first 2 quarters and we're going to slow -- trend up particularly in the third and fourth quarter. So that's the main driver for that trend in the second half.

90.    The statements in ¶¶84-89, above, were materially false and/or misleading or

omitted material information necessary to make them not misleading for the following reasons:

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

a. The transformation was not being successfully executed where Formosan termites had become prevalent and the scheme to mitigate the related costs had derailed customer service initiatives which would negatively impact future growth.  For example, Terminix regularly failed to provide: (i) an effective initial inspection for Formosan termites; (ii) effective treatment for Formosan termites; or (iii) necessary remediation of Formosan termite infestations suffered by its customers in Formosan hot spots.

b. As a result of the foregoing, claims and corresponding damages were skyrocketing and in an effort to mitigate its liability, the Company cut customers' benefits and raised the costs for them to renew their contract by as much as 1000% in hopes that: (i) customers with costly Formosan termite infestations that would not renew their contracts before they discovered infestations that the Company was contractually obligated to remediate; (ii) the Company could limit its liability for infestations; and (iii) recover litigation costs.

c. The scheme to drive off its customers and cover the costs of damage claims in areas impacted by the Formosan termite were the driver price increases.

d. Contrary to claims that it was increasing revenue and growth through its focus on customer service, costs related to Formosan termite damage and the payment of customer claims arising from such damage had cost the Company tens of millions of dollars and the Company knew these costs would continue to impact its profitability.

e. The Company's refusal to pay its customers' damages, which were caused in part by the failure to provide inadequate treatment, only increased its liability.  The

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

scheme delayed the payments of awards, and the recognition of such losses, absent any legitimate basis.  As a result: 1) the Company materially understated the accrual associated with damages claims throughout the Class Period and artificially inflated the Company's reported adjusted EBITDA; and 2) the statements regarding the successful execution of its customer service transformation and its current and expected financial impact were materially misleading and/or omitted material information necessary to make them not misleading.

91.    The $2 million increase in damage claim expense due to activity in the Gulf Coast was a red flag that should have alerted the Individual Defendants to these issues, particularly after seeing similar increases in prior quarters.

92.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████    ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████

93.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

### C.    The Truth Slowly Emerges

94.    On October 22, 2019, ServiceMaster announced its preliminary financial results for 3Q19, which revealed that Adjusted EBITDA had declined 11% year over year due in part to "$2 million in termite damage claims arising primarily from Formosan termite activity."  The press release admitted that "Formosan termite activity has been increasing over the last few years" and that ServiceMaster had taken "mitigating actions" in response to this known trend as early as 2018, including "a change in pricing structure":

> The increase in termite damage claims includes the resolution of a single $2 million termite damage claim from 2016. Termite damage claims can take years to fully settle, and timing can be difficult to forecast. Assuming the continuation of recent trends, the company expects higher claims costs to continue in the short-term due to increased claims activity. Formosan termite activity has been increasing over the last few years, however due to a number of climatic and environmental factors it remains largely concentrated in the Mobile, Alabama area of the country, which represents less than one percent of Terminix revenue. ***Starting in 2018, the company initiated mitigating actions to limit our future exposure, including third party claims management, reinforcement of effective processes, improved documentation, and a change in pricing structure.*** We have undertaken several other operational changes over the last 18 months and are confident that we can continue to manage the impact of termite damage claims within our projected long-term 30 percent incremental margins.

95.    In the same press release, ServiceMaster stated that the changes to pricing led to fewer renewals.  Specifically, the Company stated that organic revenue growth was offset by "a reduction in termite renewals driven partially by managed reductions from price increases in the Formosan termite market of Mobile, Alabama."

96.    Also in the same press release, ServiceMaster announced that Stevenson would be leaving the Company.

97.    Analysts were shocked by these revelations.  The Buckingham Research Group issued a report on October 22, 2019 stating:

> ***Termite claims are popping up seemingly out of the blue in Alabama*** . . . .We saw some lawsuits filed but we saw no evidence of any trouble in SERV's numbers until

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

the preannouncement earlier this week.    *Terminix is nowhere near as far along in its transformation progress as we thought*.

98.    Morgan Stanley issued a report the same day acknowledging that the new damage claims costs "were not anticipated" by stockholders.

99.    On this news, the Company's share price fell $11.44, or 20%, to close at $44.70 per share on October 22, 2019.

100.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

101.    On November 5, 2019, ServiceMaster announced that Q3 2019 had been impacted by "legacy risks," including "termite damage claims."  The press release further claimed that "strong actions" to address these risks "were initiated *in early 2018*."

102.    The Company held a conference call the same day, during which Varty acknowledged that one of these mitigating actions was a pricing initiative designed to drive its customers away and thereby reduce the Company's exposure to these costly claims.  Varty stated:

> At the beginning of 2019, we began a pricing initiative in the Mobile, Alabama area to better align the cost we . . . charge termite customers with the actual cost we incur to provide services in the area. We anticipated some customer reductions as a result of the pricing change, but they have accelerated faster than we originally projected and, as a result, are impacting termite renewal revenue and profitability in the short term. As these customers renew their contracts, we conduct a detailed inspection and when necessary, re-treat their properties. We have added a dedicated quality assurance team that is solely devoted to these properties and re-treatments.

103.    During the same call, Varty admitted that termite litigation had already impacted Terminix revenue by 7% to 8%, more than the historical impact of 4% to 4.5%:

The profitability levels of the business have historically included spending approximately 4% to 4.5% of termite revenue annually in the settlement of these termite damage claims nationally. And the base of our business outside of the Mobile, Alabama area continues to operate at these historical levels. . . .

In the past few years, we have seen an increase in the number and average cost of termite damage claims in the Mobile, Alabama area related to Formosan termite activity. We have also seen an increase in the number of termite damage claims in that region that involve litigation. These 2 trends have increased our termite damage claims cost as a percentage of termite revenue to between 7% and 8%. Given the increased volume we have seen, we expect additional cost increases in 2020 before our mitigating actions fully take effect and we begin to gradually return them to historical norms.

104.   During the same call, DiLucente stated that the Company "expect[ed] a year-over-year increase from damage claims of approximately $4 million in the fourth quarter."

105.   ServiceMaster's share price fell $4.83 per share (12%) by November 6, 2019 on this news.

106.   In January 2020, Varty resigned.  As one attorney with extensive experience litigating Formosan claims against Terminix observed: "[T]he rats may be jumping ship. In the last 13 weeks, as its stock price sunk like the doomed ocean liner, Matt Stevenson, the President of Terminix Residential, and Nik Varty, the CEO of ServiceMaster, have both either abandoned ship or were asked to walk the plank."

107.   On February 27, 2020, ServiceMaster released a presentation titled "Fourth-Quarter and Full-Year 2019 Earnings Webcast," which showed that nearly all of the Litigated Claims were centered in the Mobile Bay region—specifically, 40 of the 41 cases filed in 2019 were in that region.  The presentation revealed that termite damage costs were double the Company's historical expense rate from 2015 through 2019.  Moreover, these costs would remain 75% higher than the Company's historical expense rate through 2024.

108.   The presentation also showed that ServiceMaster changed its methodology for accruals for termite damage claims costs.  As reflected by the below timeline, the expense would

35

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

accrue when the case was filed, whereas historically the Company accrued expense when the case

proceeded to discovery.  As a result, the Company was forecasting $69 million in termite damage

claims expenses for 2020.



109.    On February 28, 2020, ServiceMaster filed its Form 10-K for the period ended

December 31, 2019 (the "2019 10-K"), which stated that "Recently we have experienced higher

Non-Litigated Claim activity concentrated in… 'the Mobile Bay Area'[] related to Formosan

termites, an invasive species, which has driven higher Non-Litigated claims expense."

110.    The 2019 10-K revealed that both Litigated and Non-Litigated claims in the Mobile

Bay Region had been on the rise since 2017, and were significantly exacerbated in 2019, contrary

to statements that the claim transformation efforts were succeeding:

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

| (In millions) | Litigated Claims | | | Non-Litigated Claims | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Mobile Bay Area | All Other Regions | Total | Mobile Bay Area | All Other Regions | Total |
| Outstanding claims as of January 1, 2017 | 21 | 17 | 38 | 131 | 677 | 808 |
| New claims filed | 9 | 4 | 13 | 556 | 3,126 | 3,682 |
| Claims resolved | (8) | (6) | (14) | (531) | (3,137) | (3,668) |
| Outstanding claims as of December 31, 2017 | 22 | 15 | 37 | 156 | 666 | 822 |
| New claims filed | 18 | 9 | 27 | 556 | 2,547 | 3,103 |
| Claims resolved | (9) | (7) | (16) | (448) | (2,611) | (3,059) |
| Outstanding claims as of December 31, 2018 | 31 | 17 | 48 | 264 | 602 | 866 |
| New claims filed | 40 | 1 | 41 | 735 | 2,652 | 3,387 |
| Claims resolved | (15) | (7) | (22) | (623) | (2,636) | (3,259) |
| Outstanding claims as of December 31, 2019 | 56 | 11 | 67 | 376 | 618 | 994 |

111.    The Company increased its reserves for Litigated Claims in the Mobile Bay Region from $4 million as of December 31, 2018 to $40 million as of December 31, 2019, and increased reserves for Non-Litigated Claims in the Mobile Bay Region from $7 million to $15 million during that same time period.

112.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████    ████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

## VII.    DAMAGES TO THE COMPANY

113.    As a direct and proximate result of the Individual Defendants' conduct, ServiceMaster has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.    Funds paid to settle the Alabama Attorney General investigation;

b.    Funds paid to resolve arbitrations and customer claims due to the Company's failure to observe its termite remediation responsibilities in customer contracts;

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

     c.       Legal fees incurred in connection with the Securities Class Action;

     d.       Any funds paid to settle the Securities Class Action; and

     e.       Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to ServiceMaster.

114.    In addition, ServiceMaster's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

115.    The actions complained of herein have irreparably damaged ServiceMaster's corporate image and goodwill.  For at least the foreseeable future, ServiceMaster will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ServiceMaster's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff brings this action derivatively in the right and for the benefit of ServiceMaster to redress injuries suffered, and to be suffered, by ServiceMaster as a direct result of breaches of fiduciary duty by the Individual Defendants and for contribution for violations of Section 10(b) of the Exchange Act.  ServiceMaster is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.    Plaintiff will adequately and fairly represent the interests of ServiceMaster in enforcing and prosecuting its rights.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

118.    Plaintiff has continuously been a shareholder of ServiceMaster at times relevant to the wrongdoing complained of and is a current ServiceMaster shareholder.

119.    When this action was filed, ServiceMaster's Board consisted of Defendants Caplan, Goldman, Gursahaney, Hochhauser, Sedita and non-party directors Frear, Ponton, Sebastian, and Terrill.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below

120.    As members of the Board, Caplan, Goldman, Gursahaney, Hochhauser, and Sedita had "primary responsibility for evaluating strategic and operational risk management." As alleged herein, Caplan, Goldman, Gursahaney, Hochhauser, and Sedita knew or should have known of the increasing liability from the Mobile Bay region, including from the $2 million quarterly increases to the damage claim expense in the Gulf Coast ███████████████, and the Company's purportedly mitigating actions. As a result, they knew or should have known that ServiceMaster had employed initiatives that would hamper customer retention, including due to the pricing initiative to pass on the cost of the growing liability to the Company's customers. However, they failed to disclose the same and instead allowed the materially misleading statements regarding the success of the Company's transformation efforts and prospects for growth to be disseminated in ServiceMaster's SEC filings and other disclosures.  Thus, Caplan, Goldman, Gursahaney, Hochhauser, and Sedita face a substantial likelihood of liability, and demand is excused as to them.

121.    Defendants Caplan, Goldman, Gursahaney, Hochhauser, and Sedita were also all members of the Audit Committee at all relevant times, as such, they are responsible for accounting and financial reporting processes and risk exposures, as well as, legal compliance.  In their capacities as Audit Committee members, Caplan, Goldman, Gursahaney, Hochhauser, and Sedita knew or should have known of the exposure to claims and litigation related to Formosan termites,

and reviewed and approved the Company's earnings press releases, allowing the materially misleading statements to be disseminated in ServiceMaster's SEC filings and other disclosures. Thus, Caplan, Goldman, Gursahaney, Hochhauser, and Sedita face a substantial likelihood of liability, and demand is excused as to them.

122.    Goldman, Gursahaney, Hochhauser, and Sedita could not disinterestedly consider a demand to take action in connection with the misleading 2018 10-K because they signed the 2018 10-K and are responsible for issuing materially misleading statements at issue.  As a result, Goldman, Gursahaney, Hochhauser, and Sedita would be interested in a demand regarding their own wrongdoing and demand is futile as to them.

## IX.    CLAIMS FOR RELIEF

**<u>Count I</u>**

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

123.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

124.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ServiceMaster's business and affairs, particularly with respect to issues as fundamental as public disclosures.

125.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ServiceMaster.

126.    In breach of their fiduciary duties owed to ServiceMaster, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

127.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall prospects.

128.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ServiceMaster has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## Count II

### (Against Defendants Varty and DiLucente for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act)

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    Defendants Varty and DiLucente are named as defendants in related securities class action. The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

131.    ServiceMaster is named as a defendant in related securities class action that alleges and asserts claims arising under Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If ServiceMaster is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

132.    As officers, directors, and otherwise, Defendants Varty and DiLucente had the power or ability to, and did, control or influence, either directly or indirectly, ServiceMaster's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

133.    Defendants Varty and DiLucente are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

134.    Defendants Varty and DiLucente have damaged the Company and are liable to the Company for contribution.

135.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of ServiceMaster, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of ServiceMaster and that plaintiff is an adequate representative of the Company;

B.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other wrongs;

C.    Declaring that the Individual Defendants have breached their fiduciary duties to ServiceMaster;

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

D. Directing ServiceMaster to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ServiceMaster and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a proposal to strengthen ServiceMaster's oversight of its disclosure procedures; and

4. a provision to permit the stockholders of ServiceMaster to nominate at least three candidates for election to the Board;

E. Awarding to ServiceMaster restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

F. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## XI. JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff hereby demands a trial by jury.

This Redacted Complaint Is Filed Pursuant To Court Order And Stipulation Of Dismissal

December 9, 2022

s/*Paul Kent Bramlett*
PAUL KENT BRAMLETT #7387
ROBERT PRESTON BRAMLETT #25895
**BRAMLETT LAW OFFICES**
P. O. Box 150734
Nashville, TN 37215
Telephone: (615) 248-2828
Facsimile:  (866) 816-4116
E-Mail: pknashlaw@aol.com
        Robert@BramlettLawOffices.com


**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs Michaels
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 935-7400
bsachsmichaels@glancylaw.com

Robert V. Prongay
Pavithra Rajesh
Christopher R. Fallon
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

**LAW OFFICES OF ALFRED G.
   YATES,  J.R., P.C.**
Alfred G. Yates, Jr.
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone: (412) 391-5164

Attorneys for Plaintiff